IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DONALD MOORE,

        Petitioner,

        v.

WARDEN, LONDON
CORRECTIONAL INSTITUTION,

        Respondent.

CASE NO. 2:14-cv-572
CHIEF JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE KEMP

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the petition (Doc. 1), the return of writ (Doc. 9), Petitioner's traverse (Doc. 15), and the associated exhibits.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and that this case be **DISMISSED**.

## I.  Procedural History

On July 22, 2010, the Franklin County, Ohio grand jury indicted Petitioner and another individual, Stephanie Shahan, on eight felony counts, including counts alleging assault, failure to confine a vicious dog, intimidation of a witness, and insurance fraud. Most of the counts arose out of two attacks committed by a pit bull, one on October 5, 2009, and the other on May 9, 2010.   A subsequent indictment was returned against Petitioner on March 23, 2011, charging him with another count of felonious assault with

specification related to the May 9, 2010 incident. *Return*, Exhibits 1 and 3. Both indictments were consolidated for trial.

Petitioner pleaded not guilty and the case was tried to a jury. Four of the counts contained in the first indictment were dismissed prior to trial. The jury acquitted Petitioner on one count of felonious assault found in the first indictment but found him guilty on two other counts of that indictment (both charging him with failure to confine a vicious dog) and on the felonious assault charge contained in the second indictment. On August 30, 2011, the trial court sentenced Petitioner to a total of thirteen years of imprisonment, including a mandatory consecutive five-year term for being a repeat violent offender.

Through counsel, Petitioner appealed to the Tenth District Court of Appeals. He raised seven assignments of error: that the convictions were against the manifest weight of the evidence, that they were not supported by sufficient evidence, that the trial was tainted by prosecutorial misconduct in the form of suppression of exculpatory evidence, that various errors occurred during trial, that Petitioner was denied jail time credit, that his trial counsel was ineffective for failing to object to inadmissible evidence, and that the accumulation of those errors was a separate due process violation. *Return,* Ex. 13. In a decision rendered on August 1, 2013, the court of appeals overruled each of Petitioner's assignments of error and affirmed his convictions. *State v. Moore*, 2013 WL 3968166 (Franklin Co. App. August 1, 2013).

Acting without the benefit of counsel, Petitioner appealed to the Ohio Supreme Court. He presented six propositions of law in his appeal, all of which were presented

to the Tenth District Court of Appeals; he did not raise an issue based on the manifest weight of the evidence. *Return,* Ex. 18. The Ohio Supreme Court declined review. *State v. Moore,* 137 Ohio St.3d 1423 (Dec. 4, 2013). Petitioner also filed a post-conviction petition which is not relevant to these proceedings.

On June 13, 2014, Petitioner filed his petition for a writ of habeas corpus with this court. He asserts six grounds for relief, which he states as follows:

> **GROUND ONE**: Where there is a lack of sufficient competent and credible evidence to establish each essential element of a charged offense in a criminal case, due process is violated and reversal is required.

> **GROUND TWO**: Where a prosecutor in a criminal case withholds material and exculpatory evidence, due process is violated and reversal is required.

> **GROUND THREE**: The trial court violated Donald Moore's rights to due process, confrontation, and a fair trial and abuse (sic) its discretion when it failed to declare a mistrial, permitted inadmissible evidence to be admitted, and prevented the defense from further cross-examining a witness.

> **GROUND FOUR**: Both statutory and constitutional double jeopardy protections mandate a trial court to grant credit for each day a defendant has served in jail in lieu of bail arising out of the charge for which he is convicted.

> **GROUND FIVE**: Where counsel fails to raise proper objections to inadmissible evidence, and the defense if (sic) prejudiced thereby, the defendant has been deprived of the effective assistance of counsel, guaranteed by the state and federal constitutions.

> **GROUND SIX**: Donald Moore was denied his right to due process and a fair trial because of cumulative error. Fifth, Sixth, and Fourteenth

amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

Respondent asserts that claim six is not cognizable in federal habeas corpus, that one portion of claim three (relating to the admission of a photograph of the dog in question) was procedurally defaulted, and that all of Petitioner's claims are without merit.

## II. The Facts

The Court begins by reciting the facts as they were set out in the state court of appeals opinion. In its summary of the evidence introduced at trial, that court said:

> We will review the evidence presented at trial to support the State's case. With respect to the first incident, general testimony established that appellant, Shahan, and their two pit bulls named Caine and Chaos, lived on South Eureka Avenue in Columbus, Ohio, on October 5, 2009.
>
> Vicki Turner testified that she lived next door to appellant with her husband, mother, and four children. Her good friend Velasco–Tapia stayed with them from time to time. Despite keeping the two pit bulls, appellant and Shahan did not have a fully fenced yard. Turner testified that the dogs were habitually chained to the side fence as sole confinement. Caine was markedly more aggressive than Chaos, and in an earlier incident, Turner had observed Caine running loose outside appellant's yard. On that occasion, Caine had chased Turner's son, who was forced to jump a fence to elude the dog.
>
> Turner testified that on the day in question she, Velasco–Tapia, and Velasco–Tapia's son, Vance, were walking in front of appellant's house when Vance and appellant, who previously had been on friendly terms, began to argue. Appellant went into his house and returned to throw a bag of pretzels at Vance, and the two then physically struggled in appellant's front yard. Turner stayed on the sidewalk, but Velasco–Tapia entered the yard to intervene between Vance and appellant.

Turner testified that Shahan then opened the door to the residence she shared with appellant and Caine bolted from the house. Rather than going after Vance who was engaged in a physical confrontation with appellant, the dog then attacked Velasco–Tapia and bit her, grasping and holding her face. The dog was compelled only with great difficulty to release its hold. Appellant at this point retrieved Caine and returned him to the house.

Turner further testified that she thereafter accompanied Velasco–Tapia to the hospital. Turner identified photographs taken at the hospital of Velasco–Tapia's injuries. Turner testified that, as the dog exited the house, she heard appellant say "attack, attack." (Tr. 254.)

Velasco–Tapia testified for the State. She corroborated Turner's testimony that at the time of the attack she was staying with Turner. She stated that she was aware of Caine's temperament because on a prior occasion she had observed appellant's dog break his chain and try and chase a passerby; appellant was able on that occasion to recapture the dog before it caused any harm.

Velasco–Tapia testified that, on the day in question, she was walking with her son Vance when Vance and appellant began to fight. As she tried to intervene she was knocked to the ground. At that time, she saw Shahan open the door to their house and release Caine. The dog ran toward her and bit her, at which time she blacked out. Velasco–Tapia identified photographs taken of her injuries and described her medical treatment, including seven stitches around her right eye and a stitch and a puncture wound on her chin. She further testified that, sometime after the attack, appellant taunted her, stating that he had managed to keep his dogs despite the attack and that he wished the dog had killed her. (Tr. 566.)

Franklin County Animal Control Deputy Warden, Joseph Callison, testified that on the day of the attack upon Velasco–Tapia, he was called to the scene to assist another deputy warden. Because it was a dog bite situation, they issued a quarantine notice and ascertained that the dog lacked a license.

Callison was then questioned about a later incident involving the same dog on February 23, 2010. This incident was not directly related to either of the attacks underlying the present case, but was allowed in evidence to demonstrate Caine's temperament and aggressive nature. Callison testified that when he arrived to assist another deputy warden at the scene, they found a pit bull tied to a tree with a leash. The owner of another dog testified that the pit bull had attacked his dog.

Callison was then questioned about a third incident involving the same dog; this was the attack upon Ryan. On May 9, 2010, Callison was dispatched to South Powell Avenue and found an injured pit bull locked up in the backseat of a police cruiser. He and his partner transferred the bloody dog to their own vehicle, where the dog continued to bleed significantly. The dog was impounded and then euthanized. Callison identified several pictures taken of Caine after impoundment and then after euthenization. He described several stab wounds to the dog that had caused the dog's injuries at the time it was taken into custody. He also identified a photograph of Caine's teeth taken to establish a bite pattern for later identification in the dog bite case.

Charles Zilich testified regarding the incident described by Callison on February 23, 2010. He stated that he was walking his own dog near his home on Wrexham Avenue when a pit bull dog came running toward him. Zilich's dog placed itself between the approaching pit bull and Zilich, whereupon the pit bull grabbed Zilich's dog by the neck and would not let go. Zilich was able to free his dog only by wrapping his own leash around the pit bull's neck and choking it until it released. Zilich thereupon tied the pit bull to a tree, took his own injured dog home, and called animal control officials.

Franklin County Animal Control Deputy Warden Heath Younkin testified that he responded to this complaint and impounded the aggressive dog. Younkin also laid a foundation in his testimony on the characteristics of pit bull dogs, and established that the dog in question was a pit bull.

Franklin County animal shelter employee, Sam Goostree, described the process for dog impoundment and events related to Caine's

impoundment after the February 23, 2010 incident. On this occasion, Caine was eventually claimed by appellant on March 1, 2010. Goostree testified appellant stated that he had owned the dog for more than 30 days and that appellant was required to pay a penalty for the lack of a dog license.

A veterinary technician employed at the animal shelter testified to authenticate a photograph of appellant and Caine taken at the time of reclamation on March 1.

Angela Fuller testified to describe the facts surrounding the attack upon her son, Ryan. She stated that she lived across the street from appellant on South Powell Avenue in May 2010. She had observed that appellant had three dogs, including two pit bulls and a boxer. On Mother's Day, May 9, 2010, her son Ryan crossed the street to his grandmother's house. Ms. Fuller heard screaming and upon looking outside saw a crowd of people surrounding a dog and child. The child was lying on the ground beneath the dog with his legs extended and visible. A crowd of onlookers were beating the dog to try and get it to release the child. She ran outside and called 911, realizing that it was her son who was the victim. She began screaming for someone to shoot the dog. She saw another neighbor, Tony Marcum, run into his house and return with a large butcher knife. He promptly stabbed the dog twice, whereupon the dog did let go of Ryan. Appellant then appeared, grabbed the dog, and pulled it into his house. Ms. Fuller testified that she clearly heard appellant urge Marcum not to stab his dog.

Ryan testified that, on the day in question, he went to his grandmother's house nearby to retrieve an adapter for a new video game. As he crossed the street, he saw that Caine was outside. Ryan was afraid of Caine because Caine had previously lunged at him and tried to bite him. On such previous occasions, appellant had cautioned Ryan not to run near Caine, even though Ryan had not been running at the time. As Ryan returned home from his grandmother's house, Caine was unrestrained and lunged at him three times. Shahan observed Ryan's behavior and yelled at him not to move. Caine then bit Ryan and retained his hold. Ryan recalled that during the entire incident appellant was present, but did not help the efforts of other onlookers to get the dog to release its bite.

Appellant merely waited until the incident had ended, then grabbed his dog and ran into his own home. Ryan testified that he was immediately transported to the hospital where he stayed for approximately a day. Since the bite, he has required physical therapy and has scarring on his head, back, and neck. Ryan identified photographs of appellant, Caine, the scene, and his injuries after the bite.

Marcum testified that he lived on South Powell Avenue at the time of the incident. Appellant moved into the house next door immediately before the biting incident and Marcum went over to introduce himself. They were sharing a marijuana cigarette when they heard the commotion associated with Caine's attack on Ryan. Marcum observed that the dog was locked onto Ryan's neck and shaking him. When Marcum saw that bystanders, including Ryan's father, had no success getting the dog to release its hold through prying its jaws or beating it, he ran into his own home and grabbed a large knife. He stabbed the dog, and the dog finally let go of Ryan. He did not see what happened to the dog thereafter.

Columbus Police Officer Richard Criner testified that he was the first officer to arrive at the scene. He observed that Ryan, who was lethargic and pale, was in poor condition and urged paramedics to hurry. Upon arrival, Officer Criner observed that the paramedics performed a "swoop and go" with the victim. (Tr. 783.) Other officers removed Caine from the house and loaded him into an animal control vehicle. Upon interviewing appellant the next day, Officer Criner noted that appellant was unconcerned about injuries inflicted by his dog and complained only that his dog had been stabbed.

Columbus Police Officer Richard Adams was another responding officer. He testified that when he arrived, the victim was being loaded into an ambulance. He located the attacking dog and secured it in his cruiser, observing that it had a large stab wound in its side and was bleeding but still appeared fully capable and somewhat aggressive.

*State v. Moore,* 2013 WL 3968166 , *4-7.

### III.  Legal Standard

**The AEDPA**

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104–132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson,* 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24,(2002) (per curiam).

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus ... is on whether the state court's application of clearly established federal law is objectively

unreasonable ... an unreasonable application is different from an incorrect one." To obtain habeas corpus relief, a petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, ––– U.S. ––––, ––––, 132 S.Ct. 26, 27 (2011), quoting *Harrington v. Richter*, 5 62 U.S. ––––, ––––, 131 S.Ct. 770, 786–8 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 50 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

## IV. Discussion

### A. Sufficiency of the Evidence

In ground one of his petition, Petitioner claims that the evidence is constitutionally insufficient to sustain his conviction. An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir.2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir.1990) (en banc). In order for a

conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6th Cir.2006); *United States v. Somerset*, 2007 WL 3005746 (S.D.Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra*.

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the AEDPA, two levels of deference to state decisions are required:

> "In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir.1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must

> uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. *See* 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir.2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury-not the court-to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ––––, 132 S.Ct. 2, 181 L.Ed.2d 311, 313 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Ibid.* (quoting *Renico v. Lett*, 559 U.S. ––––, ––––, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ––––, ––––, 132 S.Ct. 2060, 2062 (2012) (per curiam ).

Petitioner was convicted of felonious assault with respect to the May 9, 2010 incident involving Ryan Fuller, and of failing to confine a vicious dog with respect both to that incident and the dog's attack on Lori Velasco-Tapia.  He claimed in the state courts, and claims now, that on each occasion, it was his girlfriend who failed to confine the dog and she alone was responsible for the attacks.

The undisputed facts of the case show that, as to the first incident, Petitioner was involved in a physical struggle with his neighbor's son, with the struggle taking place in Petitioner's front yard.  When it started, the dog, Caine, was in Petitioner's house.  His girlfriend, Stephanie Shahan, then opened the door and the dog ran out.  It did not attack the person with whom Petitioner was fighting, however, but bit Ms. Velasco-Tapia instead.  One witness testified that before that occurred, she heard Petitioner say, "attack, attack."  Petitioner claims that this evidence was not sufficient to show that he failed to confine the dog, and that the only person who did so was Ms. Shahan.

The court of appeals analyzed the issue this way.  First, it laid out the elements necessary for a conviction under Ohio Rev. Code §955.22, the statute under which Petitioner was charged.  That is, the court of appeals said, a "strict liability" statute, and at the time of the incident it provided:

> Except when a dangerous dog is lawfully engaged in hunting or training for the purpose of hunting and is accompanied by the owner, keeper, harborer, or handler of the dog, no owner, keeper, or harborer of a dangerous or vicious dog shall fail to do either of the following:
>
> (1) While that dog is on the premises of the owner, keeper, or harborer, securely confine it at all times in a locked pen that has a top, locked fenced yard, or other locked enclosure that has a top;
>
> (2) While that dog is off the premises of the owner, keeper, or harborer, keep that dog on a chain-link leash or tether that is not more than six feet in length and additionally do at least one of the following:
>
> (a) Keep that dog in a locked pen;
>
> (b) Have the leash or tether controlled by a person who is of suitable age and discretion or securely attach, [tether] * * * so that the dog is adequately restrained;

(c) Muzzle that dog.

It then noted that there was evidence from which the jury could conclude that Petitioner was the owner of the dog, which satisfies the first element of the statute, and that Ohio law also defined a pit bull - which was the breed of the dog in question - as a vicious dog.  The only remaining issue was whether Petitioner, the owner, followed the statute concerning how the dog was to be confined on his premises.  The statute provided three options: confinement in a locked pen with a top, a locked fenced yard, or another type of locked enclosure.  None of these directives was followed; Caine was loose in the house and ran out as soon as the door was opened.  That was enough, in the court of appeals' view, to refute Petitioner's claim of insufficiency of the evidence.  *State v. Moore, supra*, at \*7.

Petitioner appears to be making two arguments about why this is an unreasonable application of federal law, although he does not phrase those arguments in exactly that way.  First, he asserts that the only evidence as to his ownership of the dog was the fact that he signed for it on March 1, 2010, when it was retrieved from the animal shelter after it had gotten into a fight with another dog.  Second, he contends that the dog was properly confined on the day that Ms. Velasco-Tapia was attached because he "made sure the dog was in the house when he returned outside."  *Traverse*, Doc. 15, at 10.  In his state court brief (*Return*, Ex. 13) he argued that the imposition of strict liability in this case produced an unfair result - an argument that has no federal constitutional dimension and which he does not repeat here - and, again, that Caine was

properly confined in the house, that Petitioner had no control over Ms. Shahan's decision to let the dog loose, and that his signing for Caine on March 1, 2010, as the dog's owner was the only evidence of ownership.

The first part of this argument is premised upon the assertion that confining a vicious dog inside a house - but not in any of the ways specified in Ohio Rev. Code §955.22 - is a "proper" means of confinement.  But the statute simply does not say that. A jury could easily have found, even from the facts recited by Petitioner, that Caine was not in a locked pen, locked fenced yard, or other locked enclosure.  The second part of the argument is premised upon an assertion that the jury could not have inferred from Petitioner's signed statement on March 1, 2010, concerning his ownership of Caine, that he owned Caine on October 5, 2009.  But the jury also had before it evidence that Petitioner lived in the same house, with the same dog, back in October, and that Petitioner chained the dogs outside and customarily exercised control over them, including retrieving Caine once when his chain broke.  They also had evidence that he issued commands to Caine and left with the dog after the dog bit Ms. Velasco-Tapia. Finally, Ms. Velasco-Tapia testified that Petitioner taunted her after the incident, referring to Caine as "my dog."  *Return*, Doc. 9, Trial Transcript, at PAGEID#997.  From all this evidence, a reasonable juror could have concluded that Petitioner owned Caine on October 5, 2009, or that he was a "keeper or harborer" of that dog on that day.  Even if one disagrees with that conclusion, it is important to remember that under the AEDPA, the issue here is not whether the evidence was actually sufficient, but whether

the court of appeals reasonably concluded that it was. The Court has no difficulty saying that a reasonable jurist could reach just that conclusion.

The same analysis applies to the other conviction for failing to confine a vicious dog. The evidence of ownership is even stronger on that date since Petitioner made his written statement about owning Caine only a few months before. On the issue of confinement, the victim of the on May 9, 2010, attack, Ryan Fuller, testified that Caine was outside and not restrained in any manner when the attack happened. A jury could certainly have found that the statute was violated based on that testimony alone.

Lastly, Petitioner was also convicted of felonious assault for the attack on Ryan Fuller. Again, the state court began its analysis by reciting the applicable statute, Ohio Rev. Code §2901.01(A)(5), which defines felonious assault as knowingly causing serious physical harm to another or causing or attempting to cause serious harm to another by means of a deadly weapon or dangerous ordnance. It determined that there was no dispute that Ryan suffered serious harm - the evidence showed that he spent a day in the hospital after the attack, required physical therapy, and has scarring on his head, back, and neck from where he was bitten - so that the only real issue was whether there was evidence from which the jury could have found that Petitioner "knowingly caused" Caine to attack Ryan. In deciding that issue against Petitioner, the state court said:

> Under circumstances that are not clarified by the evidence, Caine ran
> loose in the neighborhood and viciously attacked a child. A "person acts
> knowingly, regardless of his purpose, when he is aware that his conduct
> will probably cause a certain result or will probably be of a certain nature.
> A person has knowledge of circumstances when he is aware that such
> circumstances probably exist." R.C. 2901.22(B). Appellant, as discussed
> above, is guilty of the crime of failure to confine a vicious animal in

connection with the assault on Ryan. Given Caine's prior aggressive conduct, including multiple attacks or attempted attacks described by the witnesses, the jury could properly draw the inference that appellant must be charged with the knowledge that his conduct in allowing Caine to run loose would probably cause an attack such as that endured by Ryan. We accordingly find that the element of "knowingly" under R.C. 2903.11 is supported by sufficient evidence in this case, and the jury did not find against the manifest weight of the evidence when it convicted appellant of felonious assault.

*State v. Moore, supra*, at *8.

After making an argument about whether the indictment properly charged the date of Ryan Fuller's attack - again, an issue not before this Court - Petitioner claims that the evidence showed unequivocally that he was not at home at the time of the attack and that he had left the dog securely confined in his house.

This is what the evidence actually was. Petitioner was present for at least some the attack; Ryan's mother testified that before Caine was stabbed by one of the neighbors, and while he still had a grip on Ryan's neck, Petitioner asked the neighbor not to stab his dog. Once Caine released Ryan, Petitioner took him back into the house. Prior to the attack, Petitioner had been smoking a marijuana cigarette with the same neighbor, Tony Marcum. He had just come to Mr. Marcum's door, however, and it was "not long" after that when they heard screaming and went to see what was happening. Petitioner unsuccessfully tried to break the dog's grip on Ryan by putting a stick in the dog's mouth before Mr. Marcum got a knife and stabbed the dog. Ryan himself testified that on the day of the attack, he had walked to his grandmother's house, which was on the same street as his residence and Petitioner's, and noticed that Caine was in

the front yard.  He stayed at his grandmother's for only five minutes and almost as soon as he left the house, Caine attacked.

"Circumstantial evidence from which a reasonable inference of guilt beyond a reasonable doubt may be drawn is constitutionally sufficient."  *Alder v. Burt,* 240 F.Supp.2d 651, 661 (E.D. Mich. 2003).  Here, although there was no direct proof as to how Caine came to be outside or who let him out (the court of appeals correctly observed that these factors were "not clarified by the evidence," *see Moore, supra*), a reasonable juror could have inferred that Petitioner, who had arrived at Mr. Marcum's home at about the same time Ryan arrived at his grandmother's, had let the dog out, or knew it was out, before he left his house, because Ryan testified that the dog was loose in the yard when he walked to his grandmother's.  There was testimony that on other occasions, including one involving Ryan, Petitioner was outdoors with the dog while the dog was unrestrained.  Again, the issue here is not whether this evidence was sufficient to prove that Petitioner knew that Caine was outside in the yard at the time, but whether the state court unreasonably found the evidence to be sufficient.  Although presenting a closer issue than the one involving the failure to confine conviction, the Court is persuaded that a reasonable state court judge, applying the deference due to the jury's factfinding under *Jackson v. Virginia,* 443 U.S. 307 (1979), could have concluded that a rational juror, presented with this evidence, itself could have found that Petitioner was aware of Caine's being loose and unleashed in the minutes before Ryan was attacked.  That is enough to warrant the denial of habeas corpus relief.

### B.  Withholding Exculpatory Evidence

Petitioner's second claim is that the prosecutor violated the Due Process clause by withholding exculpatory evidence, a practice condemned by the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963).  The evidence in question was information about a potential defense witness, Traci Pace, who was present at the time of the attack on Lori Velasco-Tapia.  Petitioner argues that the prosecutor withheld evidence of the true name of this witness, and her location, for a sufficiently long period prior to trial so that, when the true information was disclosed, counsel did not have enough time to locate and to call Ms. Pace to testify.  Had she testified, Petitioner claims she would have provided exculpatory evidence both as to the attack on Ms. Velasco-Tapia and the attack on Ryan Fuller, even though she was not present when Caine attacked him.

The facts underlying this claim are as follows.  The State, when providing discovery, identified one of the witnesses to the October 5, 2009 attack as "Tracie Brihm."   In fact, the witness had a son whose last name was Brihm, but her last name was Pace.  That specific information was not provided to Petitioner's counsel until the first day of trial; Petitioner argued to the trial court that the State had known the true last name of the witness approximately three months earlier but failed to inform defense counsel of that fact.  *See* Trial Transcript, at 330.  Counsel represented that, if called, Ms. Pace would have been an exculpatory witness

> Because, one, I think she says that the codefendant, Stephanie Shahan, let the dog out of the house.  If the dog is in the house, the dog is properly confined.  So she let the dog out of the house.
>
> And, secondly, my client did not knowingly or willingly or intentionally have the dog engaged with either one of these two people, not to mention that the dog is on his premises, on his property, and that these

people are trespassers, and they are on the land of another, being that of
Donald Moore, to commit a crime, an assault, which is what Ms. Vicki
Tapia testified to, that they were fighting.  That's all exculpatory evidence.

Tr. 333.  Earlier, counsel had also represented that Ms. Pace never heard Petitioner tell

the dog to attack, and that she was close enough to have heard that statement had it

been made.  (Tr. 331).  The representations made about her testimony apparently were

based on the statement Ms. Pace gave to the prosecuting attorney, which was turned

over to defense counsel; the only information allegedly withheld or misrepresented was

the witness' proper name, and not the contents of her statement to authorities.  In

response to counsel's argument on this issue, the trial judge continued the trial for five

days in order to permit counsel to contact and speak to this and other witnesses.  In that

five days, Petitioner's counsel were unable to locate Ms. Pace, and she did not testify at

trial.

The state court of appeals disposed of the issue this way:

In the present case, the sole evidentiary import of the alleged
suppressed statement was that the witness in question would have
testified that, contrary to other testimony, appellant never ordered Caine
to "attack" before the dog bit Velasco–Tapia. There was already
conflicting testimony on this point presented at trial; more to the point,
appellant was acquitted of the charge of felonious assault arising out of
this incident, and therefore his encouragement of the dog has become
moot. With respect to the later attack on Ryan, the absence of this
testimony is without significant impact. In fact, further establishing that
Caine was likely to attack persons without an order or encouragement
from his owner would have weakened the defense's case.

We accordingly find that, without examining the actual nature of
the prosecutor's conduct in this case, there is no *Brady* violation because
the evidence concerned was not "material" as defined under *Brady* and
subsequent cases. Even if, arguendo, we assume that the witness

summary was improperly withheld, this resulted in no prejudice to appellant at trial. Appellant's third assignment of error is accordingly overruled.

*State v. Moore, supra*, at *9.

There is little disagreement about the legal principles which govern a prosecutor's duty to disclose potentially exculpatory evidence.  In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 86. Evidence is material "[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). "There is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir. 1996) (citing *United States v. Bagley*). "In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required." *United States v. Jones*, 766 F.2d 994, 998 n. 1 (6th Cir. 1985) (citing *United States v. Campagnuolo,* 592 F.2d 852, 861 & n. 9 (5th Cir. 1979)). "*Brady* generally does not apply to the delayed disclosure of exculpatory information, only to a complete failure by the prosecutor to disclose such information." *Carter v. Harry*, 2010 WL 2772349, at *5 (E.D. Mich. July 13, 2010) (citing

*United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002)). Where evidence is disclosed

prior to or during trial, no *Brady* violation occurs unless the defendant is prejudiced by

the timing of the disclosure. *Id.* (citing *United States v. Word*, 806 F.2d 658, 665 (6th Cir.

1986)). "The *Brady* rule does not assist a defendant who is aware of essential facts that

would allow him or her to take advantage of exculpatory evidence." *Burns v. Lafler*, 328

F.Supp.2d 711, 725 (E.D. Mich. 2004) (citing *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th

Cir. 2001)). "It is well established that '[t]here is no *Brady* violation where a defendant

knew or should have known the essential facts permitting him to take advantage of any

exculpatory information, or where the evidence is available ... from another source,

because in such cases there is really nothing for the government to disclose.' " *McClean*

*v. Romanowski*, 2014 WL 3870830, *14 (E.D. Mich. Aug.17, 2014) (quoting *Coe v. Bell*, 161

F.3d 320, 344 (6th Cir. 1998); *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004)).

As Petitioner acknowledges, the state court of appeals cited to *Brady* in its

opinion and correctly characterized that decision. Therefore, the question is, as the

traverse states, "whether the state court's decision involved an unreasonable application

of clearly established federal law...." *Traverse*, at 15. The Court concludes that it did

not.

The court of appeals addressed one prong of the *Brady* analysis: whether the

testimony of Ms. Pace, had it been obtained, would have been material to Petitioner's

defense. It reasonably held that the testimony would have made no difference to the

charge of failure to confine Caine on October 5, 2009, because that charge was not

premised upon whether Petitioner did or did not order the dog to attack, and because

Ms. Pace's testimony about who let the dog out was largely cumulative of other evidence which suggested that Ms. Shahan had done so.  Again, despite defense counsel's argument to the trial judge that so long as the dog was in the house, it was properly confined under Ohio law - the same argument Petitioner presents here - that is simply not the case.  As discussed above, Ohio Rev. Code §955.22 does not say that keeping a vicious dog unrestrained within a house is proper confinement.  A house is not a locked pen with a top, a locked fenced yard, or another locked container that has a top.  It was therefore reasonable for the state court of appeals to conclude that Ms. Pace's testimony was not material in the sense that it would have probably resulted in an acquittal on the charge of failure to confine.  It might have been material to the felonious assault charge involving Ms. Velasco-Tapia, but Petitioner was acquitted on that charge, so the absence of Ms. Pace's testimony did not cause him any prejudice there.

As far as the impact of her testimony on the May 9, 2010 conviction for felonious assault, Petitioner suggests here that Ms. Pace would have said that Petitioner was in the habit of properly securing the dog, and that testimony would have made the jury less likely to convict him of the assault on Ryan Fuller.  It is unclear whether such testimony would have been admissible; even if it were, however, it not unreasonable to conclude that whatever additional instances of proper dog-handling Ms. Pace could have related to the jury would not have altered the jury's finding that on May 9, 2010, Petitioner knew that Caine was outside and unleashed.  This Court cannot say that, using the test set forth in *Brady*, there was a reasonable probability that, had the jury

heard this testimony, it would have reached a different verdict on that charge.  The state

courts' similar conclusion is therefore reasonable as well; at a minimum, it is a

conclusion a reasonable jurist could have reached on this record, and therefore immune

from reversal by a federal court applying the deferential standard found in the AEDPA.

Therefore, there is no merit in Petitioner's second ground for relief.

### C.  Other Grounds for Relief

Petitioner's traverse contains the following statement (repeated here *verbatim*):

> At this time the Petitioner will concede and withdraw his Ground for
> Relief Three, Four, Five, and Six, relying on the Two issues he has
> presented to this Honorable Court, which when reviewed, unequivocally
> entitle him to the relief he seeks.  The additional Grounds for relief would
> be redundant and superfluous to the well presented and supported
> Grounds for relief which show that his constitutional rights have been
> violated and the State Court's made a mistake when it reviewed the
> evidence of Trial and, failed to reverse and remand for a new trial, based
> on a multitude of egregious violations of clear U.S. Supreme Court
> precedence, and an "objectively unreasonable" application of that law.

*Traverse*, at 18.  Given this statement, the Court will not discuss these issues further.

### V.  Recommendation

For all of the reasons stated above, it is recommended that the petition for a writ

of habeas corpus be **DENIED** and this action be **DISMISSED.**

### VI.  Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within

fourteen (14) days of the date of this report, file and serve on all parties written

objections to those specific proposed findings or recommendations to which objection is

made, together with supporting authority for the objection(s). A judge of this Court

shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

<div style="margin-left:50%">

/s/ Terence P. Kemp
United States Magistrate Judge

</div>